**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

RICHARD O. RATLIFF, JR., as
Personal Representative of the Estate
of Richard O. Ratliff, Sr. and on Behalf
of All Survivors, ROBERT D.
RATLIFF, as Personal Representative
of the Estate of Anne R. Ratliff, and on
Behalf of All Survivors, and B. B., A
Minor, individually, by and through his
legal guardians, Robert D. Ratliff and
Amy Ratliff,

     Plaintiffs,

v.                                                        Case No. 3:15-cv-893-J-32MCR

UNITED PARCEL SERVICE, INC., an
Ohio Corporation,

     Defendant/Third Party
       Plaintiff

CLASSIC TRANSPORT, INC.
     Third Party Defendants

---

**O R D E R**

     This case involving Florida's dangerous instrumentality doctrine arises out of a

tragic July 2013 automobile accident in which a UPS package car crashed into a

family's vehicle, killing Richard and Anne Ratliff and injuring their grandson. It is

before the Court on Defendant United Parcel Service, Inc., an Ohio Corporation's

("UPS") Motion for Summary Judgment (Doc. 45), to which Plaintiffs Richard O.

Ratliff, Jr., as personal representative of the Estate of Richard O. Ratliff, Sr.; Robert

D. Ratliff, as personal representative of the Estate of Anne R. Ratliff; and B.B., a

minor, individually, by and through his legal guardians, Robert D. and Amy Ratliff,

responded (Doc. 47). With the Court's permission (Doc. 54), UPS filed a reply (Doc. 55),

and Plaintiffs filed a sur-reply (Doc. 56). On October 19, 2016, the Court held a hearing

on the motion for summary judgment, the record of which is incorporated herein. (Doc.

59).

## I.   BACKGROUND

UPS is the titled owner of the package car involved in the accident, a 2014

Freightliner vehicle. UPS used UPS Supply Chain Solutions, Inc. ("SCS"), its

contracting arm, to arrange for the delivery of the package car from the manufacturer

in Michigan to a UPS facility in Jacksonville, Florida.[1]  Pursuant to the SCS Car Haul

Transportation Services Agreement ("Transportation Agreement") (Doc. 45-6), SCS

contracted with Third Party Defendant Classic Transport, Inc. ("Classic") to deliver

the package car to Jacksonville. [2]  According to the Transportation Agreement,

Classic's relationship with SCS was that of an independent contractor. (Id. at 4 ¶ 3).

Classic hired Georgia Anne Gray ("Gray"), a contract driver, to drive the package car.

(Doc. 45-7 at 5, Pontius Dep. 23:14-19; Doc. 45-8 at 7-8, Groulx Dep. 28:23-29:3).

On July 5, 2013, Richard and Anne Ratliff and their grandson were driving on

U.S. 90 in Baker County when the UPS package car driven by Gray struck the rear

---

[1] UPS states that UPS and SCS are separate and distinct legal entities within UPS's corporate structure. (Doc. 45 at 4 ¶ 8). Plaintiffs dispute UPS's statements regarding its relationship with SCS. (Doc. 47 at 3).

[2] UPS was not a party to the Transportation Agreement. Classic obtained automobile liability insurance in the amount of $1,000,000 to cover its vehicle transport operations under the Transportation Agreement. (Doc. 45-6 at 7, §§ 11.1(b), 11.2).

driver's side of the Ratliffs' car, which careened off the road and crashed into a tree. Richard and Anne Ratliff died from their injuries, and their grandson, a minor, also sustained injuries in the accident.

On September 11, 2014, Plaintiffs and Classic signed a Release Agreement settling their dispute, with Classic's insurance paying $1,000,000 and Classic contributing an additional $25,000 (Doc. 45-20); the settlement excluded UPS. On June 22, 2015, Plaintiffs filed a lawsuit against UPS and SCS in the Circuit Court of the Fourth Judicial Circuit in and for Duval County, Florida, alleging wrongful death against UPS and SCS (Counts I and II), personal injury against UPS and SCS (Counts III and IV), and negligent infliction of emotional distress (Count V). (Doc. 2). UPS and SCS removed the case on July 20, 2015 pursuant to 28 U.S.C. §§ 1332, 1441, and 1446. (Doc. 1). UPS and SCS filed third party complaints against Classic.[3] (Docs. 8, 9). On May 25, 2016, UPS filed a motion for summary judgment, contending that it is entitled to summary judgment on a dispositive legal issue: the "shop" exception to Florida's dangerous instrumentality doctrine. (Doc. 45).

## II.   STANDARD OF REVIEW

Summary judgment is proper "when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled

---

[3] On February 4, 2016, the Court dismissed SCS from the case without prejudice. (Doc. 39). In addition, on March 1, 2016, the Court dismissed without prejudice SCS's third party complaint (Doc. 9) and terminated Classic as a third party defendant in the case brought by SCS. (Doc. 42). Classic, however, remains a third party defendant in the case brought by UPS.

to judgment as a matter of law." <u>Josendis v. Wall to Wall Residence Repairs, Inc.</u>, 662 F.3d 1292, 1314 (11th Cir. 2011); Fed. R. Civ. P. 56(a), (c). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 251-52 (1986). The movant bears the burden of showing the absence of dispute as to material facts, and upon such a showing the burden shifts to the non-moving party to establish that a genuine dispute exists. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986). The evidence must be viewed in favor of the non-moving party, and all inferences drawn in her favor. <u>Anderson</u>, 477 U.S. 255.

## III.   ANALYSIS

Judicially adopted in 1920, Florida's dangerous instrumentality doctrine "imposes strict vicarious liability upon the owner of a motor vehicle who voluntarily entrusts that motor vehicle to an individual whose negligent operation causes damage to another." <u>Estate of Villanueva ex rel. Villanueva v. Youngblood</u>, 927 So. 2d 955, 957 (Fla. Dist. Ct. App. 2006) (citation omitted); <u>S. Cotton Oil Co. v. Anderson,</u> 80 Fla. 441 (1920) (adopting dangerous instrumentality doctrine). The concept was implemented based on public policy concerns:

> The dangerous instrumentality doctrine seeks to provide greater financial responsibility to pay for the carnage on our roads. It is premised upon the theory that the one who originates the danger by entrusting the automobile to another is in the best position to make certain that there will be adequate resources with which to pay the damages caused by its negligent operation. If Florida's traffic problems were sufficient to prompt its adoption in 1920, there is all the more reason for its application to today's high-speed travel upon crowded highways. The dangerous

4

> instrumentality doctrine is unique to Florida and has been
> applied with very few exceptions.

Aurbach v. Gallina, 753 So. 2d 60, 62 (Fla. 2000) (quoting Kraemer v. Gen. Motors

Acceptance Corp., 572 So. 2d 1363, 1365 (Fla. 1990)). In fact, courts have created only

three exceptions, one of which is relevant here: the "shop" exception.[4] See Castillo v.

Bickley, 363 So. 2d 792 (Fla. 1978) (recognizing shop exception to Florida's dangerous

instrumentality doctrine). In carving out the shop exception, the Florida Supreme

Court sought to "pare back" the dangerous instrumentality doctrine in service station

and repairman situations, reasoning that although "an automobile owner is generally

able to select the persons to whom a vehicle may be entrusted for general use, . . . he

rarely has authority and control over the operation or use of the vehicle when it is

turned over to a firm in the business of service and repair." Id. at 793. Therefore, the

court held that "the owner of a motor vehicle is not liable for injuries caused by the

negligence of the repairman or serviceman with whom the vehicle has been left, so

long as the owner does not exercise control over the injury-causing operation of the

vehicle during the servicing, service-related testing, or transport of the vehicle, and is

not otherwise negligent." Id.

Here, UPS contends that the shop exception applies, and therefore, it is not

liable for Plaintiffs' injuries under the dangerous instrumentality doctrine. (Doc. 45).

UPS argues that the delivery of the package car was a service contracted for between

---

[4] The two other judicially-created exceptions include: the theft or conversion exception, see Hertz Corp. v. Jackson, 617 So. 2d 1051 (Fla. 1993); and the "bare naked title" exception, see Aurbach, 753 So. 2d at 62.

SCS and Classic. Specifically, UPS points to Gray's pre-trip inspections, such as checking the tires, looking for dents and scratches, and ensuring no damage occurred in the evening and that the package car was safe to operate, as examples of how Gray serviced the package car. (Doc. 45 at 6). Next, UPS asserts that it did not exercise control over the injury-causing operation of the package car because it was not in possession of the vehicle and did not control Gray or Classic's operation of the vehicle during its transportation. (Id. at 19-20). UPS distances itself from control over the package car, noting that SCS hired Classic (an independent contractor), and Classic hired Gray (another independent contractor). According to UPS, Classic controlled the operation of the package car under the Transportation Agreement, which states that Classic "shall have control of its activities with the right to exercise independent judgment as to performing its obligations under [the] Agreement" and that Classic's "relationship with SCS shall be that of an independent contractor." (Id. at 19; Doc. 45-6 at 4 ¶ 3). Finally, UPS reasons that it was not "otherwise negligent," as it had yet to possess the vehicle and could not maintain or affect its condition.[5] (Doc. 45 at 20).

Despite UPS's arguments to the contrary, this case closely resembles the scenario contemplated by the Florida Supreme Court when it fashioned the dangerous instrumentality doctrine in Southern Cotton Oil and applied it in Demshar v. AAACon Auto Transport, Inc., 337 So. 2d 963 (Fla. 1976).[6] In Demshar, an automobile owner contracted with AAACon Auto Transport, Inc., a transportation company, to have his

---

[5] Plaintiffs do not contest this point, so the Court will address it no further.

[6] Demshar was decided two years before Castillo created the shop exception.

6

car transported from Florida to Ohio. AAACon hired Snyder, an independent

contractor, to deliver the car, and during delivery, Snyder negligently operated the car

and injured others. Thereafter, an action was brought against Demshar and his

insurer to recover the amount paid by AAACon's insurer to settle claims arising from

the accident. The Florida Supreme Court adopted the appellate court's opinion on the

insurance coverage issue in its entirety.

After resolving the insurance dispute, the Florida Supreme Court separately

addressed whether Demshar and his insurance carrier were liable in the first instance

for Snyder's negligent operation of his car under the dangerous instrumentality

doctrine. Demshar, 337 So. 2d at 966. The court found that, although the petitioners

argued that Snyder was AAACon's agent as a matter of law, the bill of lading Demshar

signed "expressly stated that the driver was not to be the auto transport company's

agent but an independent contractor." Id. The court characterized AAACon's role as

"more in the nature of a transportation broker," and as such, Snyder was an

independent contractor who was "not under the direction or control of AAACon." Id.

Snyder's use of Demshar's vehicle was considered "permissive, and any result other

than to hold the owner [Demshar] and his [insurance] carrier liable under

circumstances such as these would vitiate the dangerous instrumentality doctrine

which is thoroughly embedded in the law of this State." Id. (citations omitted).

A mere two years later, the Castillo court announced the shop exception to the

dangerous instrumentality doctrine. While finding the owner not liable, the Castillo

court emphasized in a footnote that its decision "[did] not address other situations in

7

which independent contractors, bailees, or other types of permissive users may be operating an owner's vehicle without express or implied control and direction" and cited one case: <u>Demshar</u>. <u>Castillo</u>, 363 So. 2d at 793 n.4.

The parallels between this case and <u>Demshar</u> are unmistakable. The Court need only compare owners Demshar and UPS (through SCS), transportation brokers AAACon and Classic, and drivers Snyder and Gray to see the similarities. However, in its reply, UPS attempts to distinguish <u>Demshar</u> on three grounds: (1) <u>Demshar</u> did not concern a vehicle owner yet to receive a new vehicle; (2) <u>Demshar</u> did not concern a subcontractor who performed various pre-trip service inspections to the vehicle being transported; and (3) the Transportation Agreement expressly prohibited the independent contractor, Classic, from using Gray to drive the package car. (Doc. 55 at 2).

However, these arguments are unavailing. First, UPS fails to cite any cases in which the titled owner's actual possession of the car is relevant. Second, as noted <u>infra</u> pp. 10-13, Gray's pre-trip inspections do not constitute service to the vehicle as contemplated in the shop exception cases. Finally, to the extent UPS argues in its reply that Gray was not a permissive driver, at the hearing, UPS agreed that Gray was a permissive driver, and thus this argument, too, is without merit.

At oral argument, UPS attempted to factually distinguish <u>Demshar</u> based on the degree of control that Classic exerted over Gray. It is not readily apparent why it makes a difference under <u>Demshar</u> whether Gray is Classic's agent or an independent contractor. Yet despite at other times characterizing Gray as an independent

8

contractor, UPS in an effort to distinguish <u>Demshar</u> now appears to contend that Gray was Classic's agent.[7] This effort fails. The Florida Supreme Court in <u>Demshar</u> found that Snyder was a permissive user and not under the direction or control of AAACon because there was evidence of Snyder's being an independent contractor. <u>Demshar</u>, 337 So. 2d at 966. Like Snyder, Gray was a permissive user of UPS's vehicle. Moreover, in its motion, UPS states multiple times that "Gray was an independent contractor of Classic." (Doc. 45 at 10, 20). But now to try to show Classic's "control" of Gray, UPS points to Classic keeping a driver qualification file on her, maintaining her driving logs, requiring a Department of Transportation physical, paying her, hiring her, retaining the right to fire her, and making her call in twice a day. However, as in <u>Demshar</u>, the contract between Classic and Gray establishes Gray's status as an independent contractor.[8] (Doc. 45-17). As such, Gray's role mirrors Snyder's in

---

[7] In its motion for summary judgment, UPS states that Gray is an independent contractor of Classic. However, UPS stated at oral argument that it was taking the position in its third-party case against Classic that Gray was an agent, not an independent contractor, of Classic. UPS takes yet a different position in its third party complaint against Classic, in which it states: "At all times relevant hereto, Georgia Anne Gray was a Classic Transport <u>employee</u> . . . ." (Doc. 8 at 15 ¶ 8) (emphasis added). These apparent contradictions make UPS's argument hard to follow.

[8] The Driveaway Service Contract ("Driveaway Contract") provides that Classic and Gray "desire to enter into a Contract for the provision of Contract Services to drive/operate motor vehicles . . . in an ***independent contractor*** relationship and nothing in this Contract shall be construed as inconsistent with such status." (Doc. 45-17 at 2) (emphasis in original). Moreover, the Driveaway Contract provided that Gray would "select and utilize the safest and most direct routes; determine the hours to drive and be on duty as permitted by applicable federal regulations; and deliver the Vehicle with reasonable promptness as directed by Shipper and/or Owner of the Vehicle." (<u>Id.</u> at 3). Gray was "<u>in control of</u> the means and manner by which the Contract Services are completed including the observance of posted speed limits, the selection of fuel stops, rest periods, lodging, and the use of a tow car." (<u>Id.</u>) (emphasis added). In addition, the Bill of Lading signed by Classic and Gray stated "receipts for

Demshar as well as that of Young, the truck driver in King v. Young, a case relied

upon by the Demshar court in analyzing Snyder's status as an independent contractor.

107 So. 2d 751 (Fla. Dist. Ct. App. 1958) (finding that a transportation broker was

merely a middleman in a transaction to procure transportation for a shipper through

a truck driver, who was an independent contractor (not an agent of the broker) by

virtue of the fact that he was "not controlled or subject to the control of the other in

the performance of the engagement but only as to the result.").

Here, the Driveaway Contract shows that Gray controlled the details of the

drive to Jacksonville. The facts that UPS has identified which allegedly show that

Classic controlled Gray are simply not sufficient to distinguish this case from Demshar

and King. Given the compelling similarities between this case and Demshar and King,

bolstered by the Castillo court's statement in footnote four that the shop exception did

not apply to the factual scenario in Demshar, the dangerous instrumentality rule

remains applicable to UPS in this situation.

Furthermore, the shop exception does not apply here. Neither Classic, nor its

independent contractor, Gray, provided a service as defined in Castillo.[9] Although

UPS argues that Classic was providing the service of delivering the car, and Gray

performed services through pre-trip inspections, "all of the cases applying the 'shop'

---

expenses for tolls, permits, etc. must be faxed with the POD." (Doc. 45-9 at 2). Each of these contractual provisions demonstrates that Gray acted as an independent contractor while delivering the vehicle.

[9] Courts have rejected the contention that the independent contractor status of the operator of the vehicle is the determining factor in insulating the owner from liability. See Jack Lee Buick, Inc. v. Bolton, 377 So. 2d 226, 228 (Fla. Dist. Ct. App. 1979) (citing Castillo, 363 So. 2d at 793 n.4 (citing Demshar, 337 So. 2d 963)).

exception have involved servicing or repairing the motor vehicle itself—not providing a service to the owner." Villanueva, 927 So. 2d at 959.[10] Here, UPS directed SCS to have the package car transported to Jacksonville, which it did by contracting with Classic. And Classic merely hired Gray to deliver the package car. Such actions are not servicing the motor vehicle itself. Just as AAACon and Snyder did in Demshar, Classic and Gray simply moved the vehicle from one state to another. Indeed, UPS identifies no cases in which a delivery with pre-trip inspections like this one constitutes a service under the shop exception.

Classic's delivery of the package car more closely parallels Bolton, in which Jack Lee Buick, a used car dealership, was found liable for an accident which occurred while one of its cars was driven between the dealership and the shop where the car was to be detailed. See Bolton, 377 So. 2d at 228 (approved by the Florida Supreme Court in Michalek, 524 So. 2d 426). There, the operation of the car had nothing to do with the repairing of it, but was "purely for the accommodation or convenience of the owner." Id. The court did

> not detect, in the Castillo court's decision to "pare back" the
> dangerous instrumentality doctrine in service station and

---

[10] UPS's characterization in its motion of the Florida Supreme Court's language in Villanueva is misleading. (Doc. 45 at 22-23). In Villanueva, the Florida Supreme Court agreed to review the case based on alleged conflict with Michalek v. Shumate, 524 So. 2d 426 (Fla. 1988); Castillo, 363 So. 2d 792; Fought v. Mullen, 609 So. 2d 726 (Fla. Dist. Ct. App. 1992); Roberts v. United States Fid. & Guar. Co., 498 So. 2d 1037 (Fla. Dist. Ct. App. 1986); Smilowitz v. Russell, 458 So. 2d 406 (Fla. Dist. Ct. App. 1984); and Fahey v. Raftery, 353 So. 2d 903 (Fla. Dist. Ct. App. 1977). Youngblood v. Estate of Villanueva, 959 So. 2d 215, 216 (Fla. 2007). Upon further consideration, however, the court found that jurisdiction was "improvidently granted" and dismissed review. Id. The court did not opine on the merits of the case or whether a conflict actually existed. Thus, Villanueva stands as good law.

> repairmen situations, any intention to extend the paring
> process so as to relieve the owner of liability for accidents
> while the automobile is simply "going or coming" to or from
> the owner to the place where the repairs take place.

Id. Similarly, Gray's operation of the car was for UPS's convenience. UPS is a package-delivery company with employees who routinely drive on public streets as part of their job descriptions. Similar to Jack Lee Buick, UPS ostensibly had the alternative of driving the package car to Florida with its own employees, rather than use Classic and Gray, and UPS did not show any need for it to relinquish control over the package car while it was being driven on public streets. See id.

It is true that courts are instructed not to focus too much on the type of service at issue in applying the shop exception. See Michalek, 524 So. 2d at 427 (declining to distinguish between types of service because the owner has no more control over vehicle's use once delivered regardless of the service offered). However, by characterizing Gray's pre-trip inspections as services, UPS is reaching. The package car was new. (Doc. 45 at 20). Neither party argues it was in need of repair or service. Instead, Gray's pre-trip inspections were at most tasks incidental to delivering the car. For instance, UPS does not argue that SCS engaged Classic to fix, clean, auction, or valet park the package car—all actions which Florida courts construe as services under the shop exception. See Castillo, 363 So. 2d 792 (repair); Bolton, 377 So. 2d 226 (car wash); Michalek, 524 So. 2d 426 (car cleaning agency); Fought, 609 So. 2d 726 (auction); Baptista v. Enter. Leasing Co., 707 So. 2d 397 (Fla. Dist. Ct. App. 1998) (valet park). Moreover, given the Florida Supreme Court's opinion in Demshar and the Castillo footnote excluding Demshar from its holding, Gray's delivery and pre-trip

inspections of the package car are not services as contemplated in <u>Castillo</u>.[11] "For the 'shop' exception to retain its meaning, it cannot be extended to a bailment by the vehicle owner to any entity other than a service or repair shop." <u>Villanueva</u>, 927 So. 2d at 959. Courts have therefore construed <u>Castillo</u> as receding from the broad liability imposed upon an owner under the dangerous instrumentality doctrine "only to a limited extent." <u>Bolton</u>, 377 So. 2d at 228. Although UPS says that it is simply requesting an application (or at most an extension) of the shop exception, in reality it is asking the Court to announce a new exception to the dangerous instrumentality doctrine.[12] Courts have been hesitant to create additional exceptions, finding that the legislature or the Florida Supreme Court are the appropriate bodies to do so. <u>See</u> <u>Villanueva</u>, 927 So. 2d at 958 (citing <u>Kraemer</u>, 572 So. 2d at 1367).

Finally, if the Court were to rule in favor of UPS, the logical extension of such a decision would allow any vehicle owner to contract out of liability under the dangerous instrumentality doctrine. Such a result does not seem to be the intention of the Florida Supreme Court. <u>See</u> <u>Bolton</u>, 377 So. 2d at 228 ("We fail to note any indication that the Florida Supreme Court in . . . <u>Castillo</u> or other cases has suggested that liability under the dangerous instrumentality doctrine is to be determined on the basis of whether such liability has simply been 'contracted away.'").

---

[11] Because the Court has found that the delivery does not constitute a service, it need not analyze whether UPS had control over the package car, Classic, or Gray.

[12] At oral argument, UPS agreed that "there has never been an exception made in a factual scenario like this."

While there may be room for a legitimate policy debate regarding whether there should be an exception to the dangerous instrumentality rule in these circumstances, that is not this Court's role. See Villanueva, 927 So. 2d at 959. The federal court, sitting in diversity, must follow the teachings of the Florida Supreme Court. See Starling v. R.J. Reynolds Tobacco Co., 845 F. Supp. 2d 1215, 1236 (M.D. Fla. 2011) ("Where the highest court—in this case, the Florida Supreme Court—has spoken on the topic, [this Court follows] its rule. Where that court has not spoken, however, [this Court] must predict how the highest court would decide this case."), adhered to on denial of reconsideration (Dec. 22, 2011) (citing Molinos Valle Del Cibao, C. por A. v. Lama, 633 F.3d 1330, 1348 (11th Cir. 2011)). The decisions of the Florida Supreme Court in Demshar and Castillo lead this Court to conclude that there is no exception to the application of the dangerous instrumentality rule in this case.

Accordingly, it is hereby

**ORDERED:**

1.  Defendant United Parcel Service, Inc.'s Motion for Summary Judgment (Doc. 45) is **DENIED**.

2.  The parties shall participate in mediation by **January 27, 2017** and shall file a notice informing the Court of the date of the mediation.

**DONE AND ORDERED** in Jacksonville, Florida the 31st day of October, 2016.

TIMOTHY J. CORRIGAN
United States District Judge

14

sj
Copies:

Counsel of record

Mediator Dudley Birder

15